UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------ x

FRANK MADERA,

**MEMORANDUM & ORDER**

Plaintiff,

10 CV 4459 (RJD) (LB)

- against -

DR. FELIX EZEKWE, DR. ELLEN
GOMPRECHT, DR. CHRISTIN
MONTALBANO, physicians for the New
York State Department of Correctional
Services, DR. LESTER WRIGHT, Deputy
Commissioner for Health Care Services for
the New York State Department of
Correctional Services, and DENNIS
BRESLIN, Superintendent of the Arthur Kill
Correctional Facility,

Defendants.

------------------------------------------------------------ x

DEARIE, District Judge

In this Section 1983 lawsuit, plaintiff Frank Madera—who was imprisoned at the Arthur

Kill Correctional Facility ("Arthur Kill") on Staten Island from March 2008 to November

2011—sues officials of the New York State Department of Correctional Services ("DOCS"),

including three treating physicians, for violating his Eighth Amendment right to adequate

medical care. The Eighth Amendment violations are premised on delays, amounting to roughly

two years, in a series of eye surgeries recommended by outside physicians. The defendants

move for summary judgment. [1]

---

[1] Madera cross-moves for summary judgment as to the defendants' affirmative defenses.
The Court denies Madera's motion without prejudice to the arguments raised therein, at least to
the extent that they are not otherwise addressed in this decision. However, the Court cites
Madera's Rule 56.1 statement in support of that motion, and the defendants' counter-statement
thereto, where necessary to supplement the record.

This is a close case for defendants Dr. Felix Ezekwe and Dr. Ellen Gomprecht, both of whom served at various points as Madera's primary treating physician at Arthur Kill. For the reasons set forth below—and particularly because the Court is required to draw all reasonable inferences in favor of the plaintiff—they are denied summary judgment. Summary judgment is granted, however, to defendants Dennis Breslin (Superintendent of Arthur Kill), Dr. Lester Wright (Deputy Commissioner and Chief Medical Officer of DOCS), and Dr. Christin Montalbano (Facility Health Services Director at Arthur Kill from August 2008 to November 2009 and one of Madera's treating physicians).

## BACKGROUND

The facts are drawn from the parties' Rule 56.1 statements and from the voluminous discovery materials proffered in support of those statements. Most of the facts are not in dispute; the central question, rather, is whether they can be read to suggest that the defendants were deliberately indifferent to Madera's medical problems. For the purposes of the narrative that follows, the evidence is construed in the light most favorable to the plaintiff and all reasonable inferences are drawn in his favor. The attached chronology sets forth some of the salient dates.

Madera arrived at Arthur Kill in March 2008. Def. R. 56.1 ¶ 1. In early April, he was evaluated by an optometrist who assessed the vision in his right eye at 20/40 and the vision in his left eye at 20/70. He was given prescription glasses to improve his vision. Id. ¶ 2.

Dr. Christin Montalbano was Madera's treating physician at Arthur Kill in late 2008. Montalbano Decl. at 2. In light of Madera's Type 2 diabetes—a condition that he had suffered since 1980, see Def. R. 56.1 ¶¶ 3-4, and which can lead to diabetic retinopathy and blindness— Dr. Montalbano recommended on September 12, 2008 that Madera be evaluated by an

ophthalmologist. Montalbano Decl. at 3. At that time, and at all times relevant to this case, requests for referrals to outside physicians from DOCS physicians were reviewed for medical necessity by a company called APS Healthcare, Inc. ("APS"). Id.; Farrell Opp. Decl. Ex. N. If APS preliminarily denied the request for referral, the request was then reviewed by the DOCS Regional Medical Director, who made the final decision as to whether the referral should be authorized. Montalbano Decl. at 3; Farrell Opp. Decl. Ex. N. APS and the DOCS Regional Medical Director denied Dr. Montalbano's September 2008 request because Madera had been examined by the optometrist in April 2008, approximately five months earlier. Montalbano Decl. at 3.

In August 2008, Dr. Montalbano became the Facility Health Services Director for Arthur Kill. Pl. R. 56.1 ¶ 3. DOCS policy documents state that the Facility Health Services Director is the "health professional supervisor to the entire health unit staff" and is "responsible for all medical aspects of health care delivery," including ensuring that "requests for consultation are reviewed and adequate specialty care services are provided in accordance with medical need." Id. 56.1 ¶¶ 14-16. According to Dr. Montalbano, this position "mainly entailed additional administrative responsibilities such as overseeing scheduling, dealing with grievances (when not handled by the Nurse Administrator) and attending Executive Team meetings, and generally did not involve additional patient-care responsibilities such as being involved with every referral sought by the physicians at the facility." Montalbano Decl. ¶ 10. Although he served as Facility Health Services Director, Dr. Montalbano was also responsible for handling his own caseload of approximately 200 patients. Id.

Dr. Ezekwe became Madera's primary treating physician in November 2008. Ezekwe Decl. ¶ 17. At various times in late 2008, Madera was treated for a variety of ailments, including

chest pains, cellulitis, and a toe ulcer. Id. ¶¶ 15-23. Patients at Arthur Kill who required medical treatment from specialists were referred to physicians at the Staten Island University Hospital ("SIUH"). Def. R. 56.1 ¶ 9. Madera was treated at SIUH for chest pains in mid-October 2008 and for problems with his toe in early December 2008. Gomprecht Decl. ¶ 18; Ezekwe Decl. ¶ 19.

On December 16, 2008, Madera complained to Dr. Ezekwe that he had been suffering from blurry vision in his right eye for two weeks. Pl. R. 56.1 Counter-Statement ¶ 2; Farrell Opp. Decl. Ex. J7. By that point, the vision in Madera's right eye had declined significantly—it was measured by Dr. Ezekwe at 20/200—although Madera's overall vision was assessed at 20/30.[2] Ezekwe Decl. ¶ 23. Dr. Ezekwe requested that Madera be examined by an ophthalmologist at SIUH. Dr. Ezekwe's request to refer Madera to an ophthalmologist at SIUH for evaluation was marked "urgent," which, according to DOCS policy, meant that Dr. Ezekwe had deemed that Madera should be scheduled for an appointment within five days. Pl. R. 56.1 Counter-Statement ¶ 4; Farrell Opp. Decl. Ex. J7. The request was approved by APS and Madera was scheduled to see an SIUH ophthalmologist on December 26, 2008. Pl. R. 56.1 Counter-Statement ¶ 7. There are no medical records, however, from either SIUH or DOCS that reflect any ophthalmological evaluation of Madera on that date. Pl. R. 56.1 Counter-Statement ¶ 8.

Three months later, in early April 2009, Madera again complained of blurry vision in his right eye. Dr. Ezekwe requested another "urgent" ophthalmological appointment at SIUH.

---

[2]     Dr. Ezekwe states that "it is [his] understanding that all vision measurements in Plaintiff's medical records only test uncorrected vision," and hypothesizes that Madera's vision would have been better if he was wearing his prescription glasses. Ezekwe Decl. ¶ 23.

Ezekwe Decl. ¶ 32. Madera was examined by an SIUH ophthalmologist on April 7, 2009. Id.

¶ 33. By this point, Madera's vision had markedly declined: it was assessed at 20/400 and 20/70

(although the records do not specify which eye was which). Madera was also diagnosed with a

cataract in his right eye and with a condition called narrow angles in both eyes. Farrell Opp.

Decl. Ex. J8. Narrow angles are an anatomical configuration of the eye that prevents internal

fluid in the eye from draining properly. Narrow angles do not, in themselves, impact eyesight.

Harden Decl. Ex. C (Expert Report of Jeffrey Schultz, M.D.). However, they increase the risk of

an attack of angle closure glaucoma, which can cause blindness if not address quickly. Id.

Patients who have narrow angles are not supposed to have their eyes dilated—a standard part of

the eye examination for cataracts and diabetic changes in the retina—because of the increased

risk of angle closure. Id.

     Narrow angles can be treated by a relatively simple procedure, called laser peripheral

iridotomy ("LPI"), in which a laser is used to make a small hole in the iris to relieve the pressure

caused by the build-up of fluid. Id. LPI takes approximately five to ten minutes per eye. Id. Dr.

Andrew Prince, an ophthalmologist who served as an expert witness for the defendants, testified

that he generally performs LPI within one to six weeks of diagnosis of narrow angles. Farrell

Opp. Decl. Ex. E. LPI was particularly important for Madera because it "had to be performed

before [his pupils] could be dilated for evaluation of the cataracts for subsequent surgery."

Harden Decl. Ex. C.

     According to notes prepared at SIUH on April 7, Madera was "to see Dr. Negat for LPI

and then will dilate to look @ cataracts and fundus." Farrell Opp. Decl. Ex. J8. The "post-clinic

comments" section of a DOCS medical record, which appears to have been inputted by DOCS

personnel based on the SIUH notes, includes the notation, "to see MD for, [sic] then will dilate to

look at cataract and fundus." Ezekwe Decl. Ex B (DOCS 1913). This DOCS record also bears the notation, "reviewed by: Felix Ezekwe, MD." Id.

SIUH personnel expected Madera to return on April 14. Ezekwe Decl. ¶ 37, Ex. B.[3] However, there was some confusion at Arthur Kill regarding the recommendations of the SIUH ophthalmologist. Ezekwe Decl. ¶¶ 35-36. Despite efforts by Arthur Kill medical staff to contact SIUH by phone, its ophthalmology clinic was only open one day per week (in Dr. Ezekwe's recollection), and the Arthur Kill staff did not realize that Madera was due back on April 14. Id. A request for a follow-up appointment at SIUH was entered into the DOCS computer system on April 17 and approved by APS on April 20. Def. R. 56.1 Resp. ¶¶ 43-44.

Madera returned to SIUH on May 15, 2009, where he was again examined by an ophthalmologist who noted his narrow angles and right eye cataract. The SIUH ophthalmologist indicated in his notes that Madera "needs insurance approval" and recommended that he return in two weeks for LPI surgery. Pl. R. 56.1 Counter-Statement ¶ 11; Ezekwe Decl. Ex. B at DOCS146.[4]

Around this time, at some point in May 2009, Dr. Gomprecht became Madera's primary treating physician.[5] Ezekwe Decl. ¶ 41; Gomprecht Decl. ¶ 2. She worked at Arthur Kill for one day each week. Dr. Gomprecht discussed the LPI procedure with Madera on June 9, 2009—three weeks after his ophthalmology appointment at SIUH—and he signed a consent form. Gomprecht Decl. ¶¶ 31-32. During this appointment, she recorded Madera's vision as 20/400 in

---

[3]     Ex. B is a compilation of various medical records for Madera. The Bates numbers for the records described in this sentence are not visible in the copies provided to the Court.
[4]     The Bates numbers for other medical records described in this sentence are not visible in the copies provided to the Court. See n. 3 supra.
[5]     In January 2010, Dr. Ezekwe assumed the role of Facility Health Services Director. Ezekwe Decl. ¶ 2.

his right eye and 20/70 in his left eye. Pl. R. 56.1 ¶ 46. APS approved Madera's LPI surgery on June 12, 2009. Gomprecht Decl. Ex. B at DOCS 1902. Dr. Gomprecht requested that an appointment at SIUH be scheduled on a "routine" basis—meaning that an appointment should be scheduled within thirty days. Yeary Decl. ¶¶ 4, 6.

Madera's LPI surgery was scheduled for June 30, 2009 at SIUH. The records reflect that Madera was transported to SIUH on that date but did not undergo surgery because the SIUH doctor was not available. The relevant SIUH notes state that Madera was "told to return" on July 7, but he did not return on that date. Def. R. 56.1 Resp. ¶ 49; Farrell Supp. Decl. Ex. V12.

DOCS records show that Arthur Kill nurse Brenda Yeary called SIUH three weeks after the cancelled appointment, on July 21, to re-schedule the LPI procedure, but was unable to reach anyone and could not leave a message because the scheduling voicemail-box was full. Yeary Decl. Ex. A at DOCS 4662-63. She called back on July 29 and was able to leave a voicemail. Id. The appointment was finally re-scheduled on July 30, but September 1 was the first date available at SIUH. Id. On July 30, Madera also complained about his vision to an SIUH nurse, who authorized him to remain in his dorm area "due to impaired vision" for the next month. Farrell Opp. Decl. Ex. J5, J13.

On August 15, 2009, Madera again complained about his eyesight. DOCS notes reflect that Madera had an increasing grey film over his right cornea and that his right eye was very cloudy. Farrell Opp. Decl. Ex. J6. Madera also described vision problems in his left eye. Id. The notes state that Madera's diabetes was "very poorly controlled." [6] Id. (emphasis in original).

---

[6]    Records show that Madera regularly purchased candy and other sweets from the prison commissary while imprisoned at Arthur Kill. Def. R. 56.1 ¶ 7. Madera states that he purchased

That afternoon, on Dr. Montalbano's orders, Madera was taken to the SIUH emergency room, where he was diagnosed with "worsening cataracts." Montalbano Decl. ¶ 10, Ex. A. The DOCS Emergency Triage / Trip Form states that "Dr. Montalbano [is] aware" and that "follow-up with retina specialist [is] already scheduled for 9/01/09." Montalbano Decl. Ex. A.

On September 1, 2009, Madera underwent LPI on his right eye. Def. R. 56.1 ¶ 16. The procedure did not improve his eyesight, nor was it intended to.

Five weeks later, in early October, Madera filed an Internal Grievance Complaint that stated that "a specialist at [SIUH] recommended laser surgery [but] I was suddenly taken off Dr. Ezekwe's case load and assigned to another [Arthur Kill] doctor, whereupon the recommended eye surgery was not performed even after I complained repeatedly." Farrell Opp. Decl. Ex. L. The grievance also stated that the surgery "still has not been performed" and that "[a]s a result, my eyes and vision have deteriorated[.]" Id. Madera's grievance was reviewed by the Internal Grievance Review Committee, which recommended that he "continue to address his issues through the sick call procedure" because it did not have the power to grant or deny outside transportation. Id. Madera then appealed the Internal Grievance Review Committee decision to Superintendent Breslin. Pl. R. 56.1 ¶ 61.

In the meantime, on October 20, 2009, Madera was taken to SIUH for a follow-up appointment. Def. R. 56.1 ¶ 18. The SIUH notes indicate that Madera's vision was assessed as "HM" in one eye and 20/70 in the other eye (although they again do not indicate which eye is

---

these items for exchange with inmates who did him favors, such as push his wheelchair, and did not consume them himself. Pl. R. 56.1 Resp. ¶ 7.

which).[7] Gomprecht Decl. Ex. B at GIO 20. They also indicate that Madera had a "dense white cataract" in his left eye. Id. The DOCS Request & Report of Consultation Form associated with the October 20 SIUH appointment states that Madera should "return in 1 month for LPI" on his left eye. Farrell Supp. Decl. Ex. V16.

Madera's grievance continued to work its way through the DOCS system. On October 29, 2009, Superintendent Breslin reviewed the grievance. Farrell Opp. Decl. Ex. L. Superintendent Breslin states that Arthur Kill medical personnel were generally involved in his evaluation of inmate grievances and that he generally relied on their assessment, given his lack of medical expertise. Breslin Decl. ¶ 5. He also testified that he was familiar with Madera's health problems, including his diminished eyesight, but was assured by Dr. Ezekwe that Arthur Kill medical personnel were aware of the seriousness of the issues and had devised an appropriate course of treatment. See generally Farrell Opp. Decl. Ex. C. Superintendent Breslin responded to Madera's grievance with the notation, "Investigation revealed that grievant's 10/6/09 appointment with Optho Clinic was cancelled by the provider not DOCS. Grievant is rescheduled. Grievance is accepted to that extent."[8] Farrell Opp. Decl. Ex. L. On November 9, 2009, Madera appealed Superintendent Breslin's decision to the DOCS Central Office Review Committee, which denied his grievance on December 30, 2009. Pl. R. 56.1 ¶¶ 62-63.

While the grievance process was ongoing, on November 2, 2009, Madera again complained about his eyesight to an Arthur Kill nurse, stating that his left eye had been growing

---

[7]     "HM" likely stands for "hand motion," which suggests that Madera's vision was very limited. See, e.g., Wendy Strouse Watt, O.D., How Visual Acuity is Measured, http://www.mdsupport.org/library/acuity.html (last visited Sept. 23, 2013) ("It is common to record vision worse than 20/400 as Count Fingers (CF at a certain number of feet), Hand Motion (HM at a certain number of feet), Light Perception (LP), or No Light Perception (NLP).")
[8]     The record does not contain any additional information about the October 6, 2009 appointment referenced by Superintendent Breslin.

increasingly blurry for the past two months. Gomprecht Decl. Ex. A at DOCS 69. DOCS records indicate that Madera was "pending eye surgery as per I/M." Id.

The next day, November 3, Madera met with Dr. Gomprecht. According to Dr. Gomprecht, her intent was to discuss Madera's eyesight, but Madera complained about foot problems stemming from his boots, which were too narrow. Gomprecht Decl. ¶ 43. Dr. Gomprecht ordered Madera a new insole for his boots because "proper footwear is very important to a diabetic patient . . . . Footwear that is too tight can cause friction, which can result in sores and bleeding, which ultimately may lead to infections that may require amputation." Id. She apparently allowed Madera to continue to wear the boots, however, while he awaited the new insoles. According to Dr. Gomprecht, her failure to discuss Madera's eye problems at the November 3 appointment was an "inadvertent oversight [that] was not intentional[.]" Id.

On November 5, 2009, Madera was examined at SIUH for cardiac issues. Gomprecht Decl. ¶ 44. He had a long history of cardiac problems, including at least five surgical operations on his heart over the prior two decades. Id. ¶ 45. On November 13, Dr. Gomprecht reviewed the cardiac-related recommendations of the SIUH doctors and scheduled an appointment with Madera to get his consent to an echocardiogram and a nuclear stress test. Id. In an affidavit prepared in anticipation of the defendants' summary judgment motion, Dr. Gomprecht states that, "given [Madera's] cardiac issues at that time, it would have been inappropriate to attempt to have the LPI on his left eye performed within the approximate one-month timeframe suggested by SIUH . . . given that the cardiac problems needed to be addressed first." Id.

Several days later, on November 19, Madera asked an Arthur Kill nurse, "What is going on with my laser eye surgery?" Gomprecht Decl. Ex. A at DOCS 66.

On November 24, 2009, eleven days after she had reviewed the cardiac-related recommendations of the SIUH doctors, Dr. Gomprecht met with Madera regarding his eyesight and obtained his consent for LPI on his left eye. Gomprecht Decl. ¶ 50. On that same day, she asked Arthur Kill staff to seek approval of the LPI surgery. Id. DOCS records show that the request for surgery was inputted into the DOCS computer system on December 2. Gomprecht Decl. Ex. B at DOCS 1886. The next day, December 3, APS sought clarification from Dr. Gomprecht regarding the request. Gomprecht Decl. ¶ 54. Dr. Gomprecht says that she was unaware of the request for clarification, however, because she did not have access to the DOCS computer system at the time. Id. The Regional Medical Director denied the request for approval for LPI surgery on December 11 because Dr. Gomprecht did not provide additional information. Id. ¶ 55.

In addition his cardiac issues, Madera suffered from asthma, a persistent cough, and an ulcer at various points in November and December 2009 and was treated on multiple occasions by personnel at Arthur Kill and SIUH. Id. ¶¶ 45-52, 56-58. In particular, Dr. Gomprecht reviewed Madera's chart on December 14 and made a note that an appointment should be scheduled so that she could meet with Madera to discuss his cardiac issues. Id. ¶ 58. She met with Madera on December 22 and discussed a proposed cardiac stress test. Id.

The saga continued on December 29, when Dr. Gomprecht again met with Madera. Gomprecht Decl. ¶ 59. At this meeting, Madera signed a consent form for the left eye LPI procedure. Id. Dr. Gomprecht realized, upon reviewing Madera's chart, that her request for the

left eye LPI procedure had been denied. Id. She re-submitted the request that day. Id. ¶ 60. It was approved by APS on January 4, 2010. Gomprecht Decl. Ex. B.[9]

On January 10, 2010, Madera complained to Arthur Kill medical staff that the vision in his left eye was getting worse and that he had a "blue discharge" from his right eye. Gomprecht Decl. ¶ 62. On January 19, Dr. Gomprecht met with Madera about podiatric issues and ordered new boots for him. Id. ¶ 64. The next day, January 20, Madera underwent a cardiac stress test at SIUH. Id. ¶ 65. The SIUH doctors determined that he might require cardiac catheterization, to which Madera consented on January 27. Id.

On February 4, 2010, Superintendent Breslin received a letter from a Legal Aid attorney advising him that Madera had not been provided with the eye surgery that had been recommended by SIUH doctors months earlier. Farrell Opp. Decl. Ex. G. The letter stated that Madera had lost a significant degree of vision in his right eye and was losing vision in his left eye. Id.

Dr. Gomprecht met with Madera on February 9, 2010 to discuss LPI and potential cataract surgery on his right eye. Gomprecht Decl. ¶ 68, Ex. A at DOCS 55. Dr. Gomprecht noted that Madera "had visual problems that are chronic," including a right eye cataract, but that "no discharge or redness was present." Gomprecht Decl. Ex. A at DOCS 55. She wrote that Madera was "awaiting laser [surgery on his left eye and] after these procedures (if cardio does not [illegible]) will need evaluation for DR [presumably diabetic retinopathy] and cataract surgery." Id. The notes of the February 9 meeting do not mention a set date for the LPI on Madera's left eye. Id.

---

[9]     The Bates numbers for the medical records described in this sentence are not visible in the copies provided to the Court. See n. 3-4 supra.

At some point in January or February 2010, LPI surgery was scheduled for March 2, 2010. On that day, Madera underwent LPI. Def. R. 56.1 ¶ 19. The LPI procedure was apparently unsuccessful. At a follow-up appointment on March 23, the SIUH ophthalmologist against performed LPI on Madera's left eye. Gomprecht Decl. ¶ 80. At this appointment, the ophthalmologist measured Madera's eyesight as 20/50 in his left eye and "LP" in his right eye.[10] He also recommended that A-scans, a pre-cataract surgery diagnostic procedure, take place within two weeks. Gomprecht Decl. Ex. B at DOCS 510.

In late March, Madera underwent a coronary angiogram at SIUH. Gomprecht Decl. ¶ 79. In early April, he was diagnosed with significant double vessel coronary artery disease and underwent a cardiac catheterization at SIUH. Id. ¶ 81. He had another cardiac-related appointment at SIUH on April 19. Id. On April 30, Madera was given a colonoscopy and was diagnosed with hemorrhoids. Id.

On April 27, 2010, Dr. Gomprecht submitted requests for two appointments with SIUH ophthalmology, one for a follow-up to the LPI and another for a cataract extraction. Gomprecht Decl. ¶ 82. These requests were inputted into the DOCS computer system on April 29. Id.; Gomprecht Decl. Ex. B at DOCS 4724. DOCS records suggest that the SIUH ophthalmologist requested that the LPI follow-up appointment take place before the cataract extraction procedures. Gomprecht Decl. Ex B at DOCS 4724. The right eye A-scan was scheduled for July 12, 2010 and the right eye cataract surgery was scheduled for August 9, 2010. Gomprecht Decl. ¶ 82, Ex. B at DOCS 35.

---

[10]     "LP" likely stands for "light perception" and suggests that Madera's vision was severely impaired. See n. 7, supra.

Madera was examined at the SIUH ophthalmology clinic on May 18, 2010, where his vision was measured at "20/HM" and 20/50. Gomprecht Decl. Ex B at GIO 17. Several days later, on May 20, he complained of blurry vision to Dr. Ezekwe. The next day, Madera was sent back to SIUH at the request of an SIUH ophthalmologist, where his vision was assessed at "20/HM OD 20/100 ph 20/60 OS."[11] Gomprecht Decl. Ex. B at DOCS 34.

On May 25, 2010, Madera met with Dr. Gomprecht. In the course of discussing his eye problems, she explained that his ophthalmological procedures had been delayed due to his heart problems and that it would take some time for his eyes to improve. Gomprecht Decl. ¶ 92, Ex. B at DOCS 29. Dr. Gomprecht's notes from that appointment state that Madera "appear[ed] to understand." Gomprecht Decl. Ex. B at DOCS 29.

On July 7, 2010, Dr. Gomprecht allowed Madera to use a wheelchair, in part due to his diminished eyesight. Pl. R. 56.1 ¶ 56. At some point while Madera was in a wheelchair, Dr. Wright, the Chief Medical Officer at DOCS, visited Arthur Kill. Farrell Opp. Decl. Ex. A. Madera approached Dr. Wright and told him that he was suffering from vision problems and that Superintendent Breslin was not addressing the issue. Id. Dr. Wright told Madera that he would follow-up with him via a note, but Madera never received any such note. Id.

On August 9, 2010, Madera's right eye cataract was removed and an intra-ocular lens was implanted. Def. 56.1 ¶ 26. The following day the vision in his right eye was measured at 20/30. Id. ¶ 27.

---

[11] In her affidavit, Dr. Gomprecht states that the SIU ophthalmologist assessed Madera's vision at 20/100 in his right eye and 20/60 in his left eye, see Gomprecht Decl. ¶ 91, but this does not appear to be an accurate interpretation of the SIUH notes. Gomprecht Decl. Ex. B at DOCS 34. Viewing the evidence in the light most favorable to Madera, his vision was assessed at 20/HM in his right eye and 20/60 in his left eye.

14

By mid-September 2010, cataract surgery on Madera's left eye had been scheduled for early November. Id. The left eye cataract was removed at SIUH on November 8, 2010. Id. ¶ 30. At a follow-up appointment at SIUH on November 16, 2010, Madera's vision was assessed at 20/20 and 20/40 (although it is not clear which eye is which). Id. ¶ 33.

Madera's eyesight subsequently declined. On March 11, 2011 he was diagnosed by an SIUH ophthalmologist with hypoperfusion of forea and capillary drop-out. Farrell Opp. Decl. Ex. J19. At present, Madera's vision is very poor.[12] According to Madera's expert, who states that Madera suffers from diabetic retinopathy, Madera's present condition "is permanent and in most cases irreversible." Harden Decl. Ex. C.

Madera filed suit on September 27, 2010. He obtained the assistance of pro bono legal counsel and filed an amended complaint on December 5, 2011. The defendants now seek summary judgment on all claims. As explained below, the Court finds that Madera exhausted the DOCS grievance process, that his vision problems are of sufficient gravity to found an Eighth Amendment claim, and that a reasonable jury could conclude that Dr. Ezèkwe and Dr. Gomprecht were deliberately indifferent to those problems and are not entitled to qualified immunity. The evidence, however, does not suffice to show deliberate indifference on the part of the remaining defendants.

---

[12] Madera was assessed at a vision level of "hand-motion" by the defendants' expert, an ophthalmologist, using a subjective test. Harden Decl. Ex. B. However, the expert believes that Madera is "malingering and exaggerating the extent of his vision loss (if any)." Harden Decl. Ex. D.

# DISCUSSION

## A.    Standard of Review

Summary judgment is appropriate if there is "no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law." Salahuddin v. Goord, 467 F.3d 263, 272 (2d Cir. 2006). "In deciding whether there is a genuine issue of material fact, [this Court] must interpret all ambiguities and draw all factual inferences in favor of the non-moving party." Id. "[I]f there is any evidence in the record from any source from which a reasonable inference could be drawn in favor of the non-moving party, summary judgment is improper." Vivenzio v. City of Syracuse, 611 F.3d 98, 107 (2d Cir. 2010).

## B.    Scope of Complaint and Exhaustion of Administrative Process

Prisoners are required to exhaust the administrative remedies that are available to them before they can file suit challenging conditions of their confinement. 42 U.S.C. 1997e(a). In order to properly exhaust the grievance process, they must "provide enough information about the conduct of which they complain to allow prison officials to take appropriate responsive measures." Brownell v. Krom, 446 F.3d 305, 310 (2d Cir. 2006). In other words, the grievance must "alert the prison to the nature of the wrong for which redress [is] sought." Espinal v. Goord, 558 F.3d 119, 127 (2d Cir. 2009). "The burden is not a heavy one; it can be analogized to notice pleading." Singh v. Lynch, 460 F. App'x 45, 47 (2d Cir. 2012).

The defendants concede that Madera exhausted his October 1, 2009 grievance, but contend that it pertained only to the September 2009 LPI and that Madera accordingly failed to exhaust the DOCS grievance process for delays relating to the March 2010 LPI and the subsequent cataract surgeries. This contention is belied by the grievance itself, which states that

16

Madera's "eyes and vision has [sic] deteriorated," that he was "examined by a specialist at [SIUH] who recommended laser surgery," and that the surgery "still has not been performed." That is enough information to alert prison officials of Madera's condition and the delays in addressing that condition. Moreover, the grievance describes an <u>ongoing</u> denial of proper eye care and thus on its face is not confined to delays in the September 2009 LPI operation, which preceded the grievance by one month. Madera thus exhausted the grievance process with regard to delays in his eye treatment.

The defendants also take issue with the First Amended Complaint, which they characterize as relating solely to delays in the September LPI procedure on Madera's right eye. Rule 8 requires only that a complaint provide "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8. The purpose of this pleading standard is "to give the defendant fair notice of what the claim is and the ground upon which it rests." <u>Matson v. Bd. of Educ. Of City School Dist. of New York</u>, 631 F.3d 57, 72 (2d Cir. 2011) (quoting <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 555 (2007)) (internal punctuation omitted). The First Amended Complaint focuses on the delayed September 2009 LPI operation, but it also refers to Madera's multiple eye surgeries and states that the "problem with [Madera's] right eye was followed by problems with his left eye, where his sight began to diminish." And DOCS medical records attached to the complaint indicate that Madera had narrow angles in both eyes and a cataract in his right eye. These statements and materials are sufficient to provide fair notice of claims relating to the subsequent operations. The defendants' argument to the contrary is wholly unpersuasive.

C. Deliberate Indifference to an Objective Medical Need

The Eighth Amendment "imposes a duty upon prison officials to ensure that inmates receive adequate medical care." Salahuddin, 467 F.3d at 280 (citing Farmer v. Brennan, 511 U.S. 825, 832 (1994)). "In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove deliberate indifference to his serious medical needs." Smith v. Carpenter, 316 F.3d 178, 183 (2d Cir. 2003) (internal quotations omitted). "This standard incorporates both objective and subjective elements. The objective 'medical need' element measures the severity of the alleged deprivation, while the subjective 'deliberate indifference' element ensures that the defendant prison official acted with a sufficiently culpable state of mind." Id. at 183-84.

1. Serious Medical Need

The first prong requires that "the alleged deprivation of medical care . . . be sufficiently serious." Salahuddin, 467 F.3d at 279. "Factors relevant to the seriousness of a medical condition include whether 'a reasonable doctor or patient would find it important and worthy of comment,' whether the condition 'significantly affects an individual's daily activities,' and whether it causes 'chronic and substantial pain.'" Id. at 280 (quoting Chance v. Armstrong, 143 F.3d 698, 702 (2d Cir. 1998) (internal brackets omitted). Diminished eyesight can be sufficiently serious to provide the basis for an Eighth Amendment claim for the denial of medical care. See Koehl v. Dalsheim, 85 F.3d 86, 88 (2d Cir. 1996); Gonzalez v. Sarreck, 2011 WL 5051341, at *17 (S.D.N.Y. Oct. 24, 2011) (Sweet, J.). In Koehl, the Second Circuit ruled that a prisoner who was denied prescription eyeglasses that were necessary to correct double vision and a loss of depth perception, and who experienced headaches and injuries from walking into objects as a

result, had a serious medical condition.  Id.; see also Tormasi v Hayman, 452 F. App'x 203, 206 (3d Cir. 2011).

The impaired vision that Madera suffered while the LPI and cataract surgeries were delayed amounts to a serious medical need of constitutional dimension.[13]  "When the basis for a prisoner's Eighth Amendment claim is a temporary delay or interruption in the provision of otherwise adequate medical treatment, it is appropriate to focus on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone[.]"  Smith, 316 F.3d at 185 (emphasis in original).  And when assessing delays in treatment, courts can take into account the failure to provide medical procedures that might have led to an earlier diagnosis of the prisoner's medical needs.  For example, in Lloyd v. Lee, the court concluded that "the injury would have been discovered earlier, and some of the serious pain and discomfort that [the prisoner] experienced for more than a year could have been averted," if the defendant doctors had not delayed the prisoner's MRI.  570 F. Supp. 2d 556, 569 (S.D.N.Y. 2008) (Chin, J.).

The record here suggests that the extraction of Madera's cataracts, which were significantly impairing his eyesight, was delayed for more than a year while he awaited the LPI procedures.  Madera complained of blurry vision in his right eye in late December 2008 and was scheduled for an "urgent" appointment with an SIUH ophthalmologist, but he apparently was not examined at SIUH at that time.  In early April 2009, after making similar complaints of blurred vision, Madera was taken to SIUH and diagnosed with narrow angles and a right eye cataract. The relatively straightforward LPI procedures, which were required before Madera could

---

[13]     There is nothing in the record to suggest that Madera's present vision problems (as opposed to the diminished eyesight that he experienced prior to cataract surgery) stem from the allegedly inadequate medical treatment—i.e. the delayed LPI and cataract surgeries—that is the gravamen of his claim.

undergo cataract surgery, were not completed until late March 2010, nearly one year after diagnosis. This evidence might also prompt the inference that Madera would have been diagnosed with narrow angles and the right eye cataract in late December 2008 if, as was intended, he had been evaluated at SIUH. When calculated from the missed appointment in December 2008, the delay in LPI surgery amounts to 15 months.

During that period—and for several months afterwards, while he awaited cataract surgery—the vision in Madera's right eye was so compromised that he was able to perceive only "hand motion." The vision in his left eye deteriorated throughout that same period. As might be expected, the diminished eyesight directly impacted Madera's lifestyle: in July 2009, he was authorized to remain in his dorm area and, in July 2010, he was permitted to use a wheelchair. This degree of visual impairment, lasting for well over a year, "significantly affect[ed] [Madera's] daily activities" and is plainly a condition that "a reasonable doctor or patient would find . . . important and worthy of comment." Salahuddin, 467 F.3d at 280. It is thus sufficiently serious to support an Eight Amendment claim.

2.      Deliberate Indifference

The second prong of the Eight Amendment medical standard requires that the prison official have been deliberately indifferent to the prisoner's serious medical need. A prison official acts with deliberate indifference when he "knows of and disregards an excessive risk to inmate health or safety[.]" Smith, 316 F.3d at 184. "The charged official must be subjectively aware that his conduct creates such a risk." Salahuddin, 467 F.3d at 281. However, the official "need not desire to cause such harm or be aware that such harm will surely or almost surely result. Rather, proof of awareness of a substantial risk of the harm suffices." Id. at 280. This

standard "entails more than mere negligence; the risk of harm must be substantial and the official's actions more than merely negligent." Id. "An inadvertent failure to provide adequate medical care" is not sufficient. Smith, 316 F.3d at 178.

Deliberate indifference is a very high standard. "[A] delay in treatment based on a bad diagnosis or erroneous calculus of risks and costs, or a mistaken decision not to treat based on an erroneous view that the condition is benign or trivial or hopeless, or that the treatment is unreliable, or that the cure is as risky or painful or bad as the malady" does not amount to deliberate indifference. Harrison v. Barkley, 219 F.3d 132, 139 (2d Cir. 2000) (citing Estelle v. Gamble, 429 U.S. 97, 105-106 (1976)). For example, in Salahuddin, the Second Circuit held that a contemporaneous letter written by the defendant doctor demonstrated his subjective belief that the prisoner did not require imminent treatment and thus that the doctor was not deliberately indifferent. 467 F.3d at 281-82.

"[M]ere differences of opinion between the prisoner and the defendants concerning the proper course of treatment" will not suggest deliberate indifference. Demata v. New York State Corr. Dep't of Health Servs., 198 F.3d 233 (table), 1999 WL 753142, at *2 (2d Cir. Sept. 17, 1999). Nor will differences among the considered medical judgments of various physicians. Victor v. Milicevic, 361 F. App'x 212, 215 (2d Cir. 2010). For example, in Alvarez v. Goord, the court found that there was no deliberate indifference for a two-year delay in eye surgery because the delays were due, in part, to attempts by various doctors to address the plaintiff's condition through less-invasive procedures involving corrective lenses. 2010 WL 1965892, at *2-5, 10-11 (N.D.N.Y. May 17, 2010) (Schroeder, M.J.).

Courts have also refused to find deliberate indifference where delays in treatment were caused by circumstances that were outside the control of the charged officials. The logistical difficulties involved in scheduling outpatient appointments and transporting prisoners to outside facilities can present one such circumstance. See, e.g., Matos v. Gomprecht, 2012 WL 1565615, at *8 (E.D.N.Y. Feb. 14, 2012) (Orenstein, M.J.), adopted by the District Court at 2012 WL 1565523 (E.D.N.Y. May 2, 2012) (Garaufis, J.); Henderson v. Sommer, 2011 WL 1346818, at *4 (S.D.N.Y. Apr. 1, 2011) (Berman, J.); Alvarez, 2010 WL 1965892, at *2-4, *10-11. So too can the denial of recommended procedures by an outside review board. See Matos, 2012 WL 1565615, at *9; cf. St. John v. Arnista, 2007 WL 3355385, *4, 7 (D. Conn. Nov. 9, 2007) (Eginton, J.). Intervening medical problems can also justify delays in treatment. See Pizarro v. Gomprecht, 2013 WL 990998, at *14 (E.D.N.Y. Feb. 13, 2013) (Bloom, M.J.), adopted by the District Court at 2013 WL 990997 (E.D.N.Y. Mar. 13, 2013) (Matsumoto, J.); Alvarez, 2010 WL 1965892, at *4, *10-11.

Many of the cases in this Circuit in which prisoners were able to show deliberate indifference involve circumstances in which prison officials made treatment decisions based on improper motives or made statements that suggested bad faith. Koehl, for example, involved prison guards who, despite having spoken with a nurse who had seen documentation of the medical necessity for the prisoner's eyeglasses, confiscated those eyeglasses and made an abusive and dismissive response to the prisoner's suggestion that the documentation was readily available in a nearby doctor's office. 85 F.3d at 88. In Harrison v. Barkley, the Second Circuit held that a doctor's refusal to remove a prisoner's painful, cavity-filled tooth until the prisoner consented to removal of another tooth was sufficient to show deliberate indifference at the summary judgment stage. 219 F.3d 132, 138 (2d Cir. 2000). While the doctor stated that the

22

removal of the other tooth was medically necessary because it was potentially life-threatening, the court suggested that the validity of the statement presented a question of fact, given that it was uncorroborated and asserted only after a state court had intervened to order removal of the first tooth. Id. And in Chance, the Second Circuit denied the prison doctors' motion to dismiss because the prisoner alleged that the doctors "recommended [a medical procedure] not on the basis of their medical views, but because of monetary incentives." 143 F.3d at 703-04.

However, significant delays in treatment can, under certain circumstances, prompt an inference of deliberate indifference. In Hathaway v. Foote, the Second Circuit concluded that a jury could infer deliberate indifference from a prison doctor's two-year delay in referring the prisoner for hip surgery, where the doctor did not alert the prisoner to the existence of two broken pins in his hip and did not refer the prisoner until after he had filed suit to compel treatment. 37 F.3d 63, 67-69 (2d Cir. 1994). The fact that the doctor had examined the prisoner on numerous occasions during those two years did not vindicate him, the court reasoned, because the doctor did not alter his ineffective course of treatment in light of the prisoner's frequent and repeated complaints of hip pain. Id. at 68.

Two recent district court cases provide further examples of delays in treatment that were sufficient to give rise to an inference of deliberate indifference. Price v. Reilly involved a prisoner with two serious medical conditions: kidney failure and a shoulder injury. 697 F. Supp. 2d 344, 349-51 (E.D.N.Y. 2010) (Bianco, J.). The prisoner requested a kidney test to determine if he was eligible for a transplant. Id. at 349-50. He had yet to receive the test by the time he was transferred to another facility nine months later. Id. During that period, his requests for testing were generally ignored, although on one occasion he was informed that doctors were prioritizing his other medical conditions. Id. The district court concluded that "where there was

23

a delay of at least nine months in arranging a kidney transplant test . . . despite plaintiff's repeated requests, and where defendants do not dispute the necessity of the test, a rational jury could find that [they] acted with deliberate indifference." Id. at 362. The plaintiff also suffered from a shoulder injury that was treated with pain medication. Id. at 351. He repeatedly complained that the medication was ineffective and requested that x-rays be taken, which he did not receive for several months. Id. The prison officials did not follow up on the x-rays and the prisoner was subsequently transferred to the new facility. Id. The district court held that "a rational jury could find that defendants acted with deliberate indifference by not changing plaintiff's pain medication despite his continued complaints that it was ineffective, by failing to take x-rays for several months, and by failing to follow up on [the] x-ray report indicating that further tests might be needed."[14] Id. at 364.

In Lloyd v. Lee, the district court concluded that a prisoner plausibly alleged deliberate indifference where his doctors requested an MRI but failed to follow up on their requests, leading to a nine month delay in treatment during which the prisoner repeatedly visited sick call and complained of extreme pain and loss of mobility in his shoulder. 570 F. Supp. 2d at 568-69. The doctors in Lloyd consistently blamed hospital staff for delaying the MRI, but the court concluded that the prisoner had plausibly alleged that they were "engaging in a blame shifting process[.]" Id. at 568. The court held, however, that the plaintiff's allegations of deliberate indifference against two of the defendant doctors were not plausible "given their limited roles early in [his] treatment." Id. at 569-70.

---

[14] The prisoner also complained of a third failure on the part of his medical providers—that they did not provide him with the proper dose of kidney medication—but the court concluded that the prisoner's mere disagreement with the course of treatment was insufficient to show deliberate indifference, particularly where the doctors repeatedly adjusted the dosage based on their evaluation of his condition. Id. at 360-61.

24

A pattern of delays can also prompt an inference of deliberate indifference.   In <u>Abdush-Shahid v. Coughlin</u>, for example, a case involving the delayed removal of a growth in the prisoner's neck, the court held that a series of delays and omissions that "taken separately may be mere negligence" could, when viewed as a pattern, "give rise to issues of fact concerning whether defendants' actions were the result of . . . deliberate indifference[.]"  933 F. Supp. 168, 182 (N.D.N.Y. 1996) (Koetl, J.).

In addition to excessive or repeated delays, "[f]ailure to heed a physician's recommendation" is a factor that "may in some circumstances constitute deliberate indifference on the part of prison officials."  <u>Demata</u>, 198 F.3d 233 (table), 1999 WL 753142, at *6 (citing <u>Kaminsky v. Rosenblum</u>, 929 F.2d 922, 927 (2d Cir. 1991)).  In <u>Demata</u>, the Second Circuit found that material questions of fact existed as to deliberate indifference given that a physician had recommended and scheduled a colonoscopy on the prisoner that was never performed.  198 F.3d 233, 1999 WL 753142, at *5-6.  Similarly, in <u>Johnson v. Wright</u>, the Second Circuit held that the fact that prison officials refused to authorize a course of treatment for Hepatitis C that was repeatedly recommended by the prisoner's doctors could suggest that the officials were deliberately indifferent, even though their refusals were based on a written DOCS policy.  412 F.3d 398, 404-05 (2d Cir. 2005).

a.     Dr. Ezekwe and Dr. Gomprecht

Specific omissions by Dr. Ezekwe and Dr. Gomprecht could, when viewed in the light most favorable to Madera and in the context of the pattern of delays in his eye surgeries, support the finding that they acted with deliberate indifference.  As an initial matter, both were aware that Madera's vision was seriously impaired.  They were also aware that the impairment in vision

was caused by Madera's cataracts and that LPI was required before cataract removal could proceed.

Upon examining Madera in December 2008, Dr. Ezekwe referred Madera to an eye specialist at SIUH on an urgent basis—meaning that Madera was to be evaluated within five days. The appointment was scheduled, but the absence of any medical documentation of the appointment suggests that it did not take place. DOCS policy requires the primary care physician to review, upon the prisoner's return from the outpatient facility, the consultation report prepared by outpatient doctor and to document her recommendations. There is no evidence, however, that suggests that Dr. Ezekwe took any steps to follow up on this apparently missed appointment—which he had himself deemed "urgent"—or took any steps to re-schedule it.

Madera was examined by an SIUH ophthalmologist on April 7, 2009, when he was diagnosed with narrow angles and a cataract and asked to return on April 14, apparently for LPI surgery. Contemporaneous record evidence shows that Arthur Kill medical personnel did not understand the instructions from SIUH until April 15. Madera was seen at SIUH one month later, on May 15. Dr. Ezekwe had not yet sought Madera's consent to LPI or requested approval for LPI from APS. At the May 15 appointment, the SIUH ophthalmologist indicated that Madera "need[ed] insurance authorization" for LPI and requested that Madera return in two weeks for surgery. The jury could draw the reasonable inference that the LPI would have gone forward on May 15 if Dr. Ezekwe had sought consent and approval for the operation.

Dr. Gomprecht became Madera's primary treating physician in May 2009. While the SIUH ophthalmologist had recommended that Madera return in two weeks for surgery, Dr.

Gomprecht did not meet with Madera to get his consent until June 9, three weeks later. An appointment was scheduled for June 30, but the SIUH doctor was inexplicably absent. The SIUH notes reflect that the hospital requested that Madera return on July 7 for the surgery. DOCS records show that an Arthur Kill nurse called SIUH to schedule a new appointment on July 21, but offer no explanation for the three week delay in scheduling.

The right eye LPI finally went forward on September 1. Madera was not seen at SIUH for a follow up appointment until October 20, nearly two months after the operation and approximately three weeks after he filed his grievance. At the October 20 appointment, the ophthalmologist asked that Madera return for left eye LPI in one month. Madera complained about his vision to an Arthur Kill nurse on November 2. Dr. Gomprecht met with him the next day, ostensibly for the purpose of discussing his eyesight. She did not do so, however, and states that she was diverted by Madera's complaints about his footwear. Dr. Gomprecht characterizes her failure to discuss Madera's eyesight as an inadvertent oversight and describes the footwear issue as pressing, given Madera's diabetes. However, she apparently allowed Madera to continue wearing the same boots.

Dr. Gomprecht did not meet with Madera regarding his eyesight until November 24, 2009, when she got his consent and sought permission from APS to schedule the left eye LPI. She stated, in an affidavit prepared for summary judgment, that it would have been inappropriate to schedule Madera for left eye LPI within the time period suggested by SIUH given the cardiac issues that he was experiencing during this period. However, the extent to which the cardiac issues actually interfered with LPI scheduling presents a question of fact, given that LPI is not a particularly invasive procedure, that Dr. Gomprecht initially attempted to schedule the LPI in late November, just one week after she reviewed the cardiac recommendations of SIUH

27

physicians, and that the SIUH ophthalmologist was ultimately able to perform LPI on Madera's left eye just one day after he underwent a cardiac angiogram.

APS sought additional information from Dr. Gomprecht in connection with her November 24 request to schedule the LPI appointment. Because Dr. Gomprecht did not respond, APS denied her request on December 11. Dr. Gomprecht, who says that she did not have access to the DOCS computer system, was unaware that APS had sought additional information about the requested surgery and apparently did not inquire as to the status of her request. She states that she did not realize that the request had been denied until she reviewed Madera's chart on December 29. However, she also states in her affidavit that she reviewed Madera's chart on December 14, three days after the referral was denied.

At some point in early 2010, Madera's left eye LPI was scheduled. The operation was completed on March 23, 2010. On that date, the SIUH ophthalmologist recommended that a follow-up appointment and A-scans (in preparation for cataract removal) take place in two weeks. Dr. Gomprecht did not submit requests to schedule those appointments until April 27, 2010, more than a month later.

All told, approximately 15 months elapsed between the "urgent" appointment at SIUH that Dr. Ezekwe scheduled in late December 2008 and LPI surgery on Madera's left eye in March 2010. Another month elapsed before Dr. Gomprecht attempted to schedule the cataract removal surgeries that would ultimately address Madera's failing eyesight. This period—during which both doctors were aware that Madera was suffering from a significant loss of vision—was marked by a long series of delays. Some of those delays were attributable, at least in part, to scheduling difficulties, to the review process for outpatient referrals, and to the SIUH

ophthalmologist's absence at Madera's June 30, 2009 LPI appointment. Other delays may have been caused by Madera's other medical issues, including diabetes and heart problems. Yet the repeated instances in which Dr. Ezekwe and Dr. Gomprecht did not follow up on missed appointments and failed to schedule new appointments within the time frames recommended by SIUH ophthalmologists, when viewed in context of the overall pattern of delays, would allow a reasonable jury to conclude that they were deliberately indifferent to Madera's loss of vision.

The record might well prompt a different conclusion. A reasonable jury could find that Dr. Ezekwe and Dr. Gomprecht provided Madera—a demanding patient presenting a host of serious health problems—with care that was more than adequate under the circumstances, and that the delays in addressing his eye problems stemmed not from indifference but from the challenges inherent to practicing medicine in the correctional environment. But on summary judgment, this Court views the record in the light most favorable to the plaintiff and draws all reasonable inferences in his favor, and is not permitted to choose which version of events that it finds most compelling. See, e.g., Hathaway, 841 F.2d at 50 (denying defendants' motion for summary judgment, but noting that the prisoner received "extensive medical attention" and "comprehensive, if not doting, health care").

b.    Superintendent Breslin, Dr. Wright and Dr. Montalbano

The evidence on the record is insufficient to show that the remaining defendants—all of whom held supervisory roles—were deliberately indifferent. There is no supervisory liability for Section 1983 claims. See LaMagna v. Brown, 474 F. App'x 788, 789 (2d Cir. 2012). Instead, supervisors can only be held liable for "personal involvement [that] satisfies the elements of the constitutional tort . . . . [B]ecause the mens rea element of an Eighth Amendment violation is

deliberate indifference, a supervisor—like any other defendant—can be held directly liable for deliberate indifference[.]" Turkmen v. Ashcroft, 915 F. Supp. 2d 314, 336 (E.D.N.Y. 2013) (Gleeson, J.); see also Ashcroft v. Iqbal, 556 U.S. 662, 676-677 (2009).[15]

Madera does not take issue with the treatment provided by Dr. Montalbano in September 2008 (when he referred Madera for examination by an outside ophthalmologist) or August 2009 (when he ordered that Madera be taken to SIUH for emergency eye care). Instead, Madera bases his claim on Dr. Montalbano's supervisory capacity as Arthur Kill Facility Health Services Director from August 2008 to November 2009 and in particular on Dr. Montalbano's "failure to act despite his awareness of the extensive delays" that Madera was experiencing. Madera posits that Dr. Montalbano was aware of the surgical delays because he treated Madera in mid-August 2009. By that point, however, Dr. Gomprecht had already scheduled Madera's right eye LPI surgery for early September—just two weeks in the future. Dr. Montalbano left Arthur Kill two months later, in November 2009. Under these circumstances, this timeframe will not permit an inference of deliberate indifference.

Madera's claims against Superintendent Breslin, like his claims against Dr. Montalbano, rest on Breslin's failure to act despite his awareness of Madera's eye problems and delays in surgery. Breslin testified that he was generally familiar with Madera's loss of vision. He also reviewed Madera's grievance and was advised by the Legal Aid letter that Madera's medical problems were ongoing as of January 2010. The receipt of letters and grievances alone will not confer liability. See Joyner v. Greiner, 195 F. Supp. 2d 500, 506 (S.D.N.Y. 2002)

---

[15] District courts in the Second Circuit have reached differing conclusions regarding the terms upon which Iqbal permits supervisors to be held liable for constitutional violations, but they agree that supervisors must satisfy the elements of the particular constitutional tort, including the requisite mens rea. See Turkmen, 915 F. Supp. 2d 333-36.

(McMahon, J.); <u>Abdush-Shahid</u>, 933 F. Supp. at 183. More importantly, Madera offers no evidence to dispute Superintendent Breslin's testimony that he investigated Madera's complaints and was assured by Arthur Kill medical staff that they had embarked on an appropriate course of treatment. Because "supervisory officials are . . . entitled to rely on the opinion of medical staff concerning the proper course of treatment," the record will not support the conclusion that Superintendent Breslin was deliberately indifferent. <u>Abdush-Shahid</u>, 933 F. Supp. at 183; <u>Joyner</u>, 195 F. Supp. 2d at 506.

The same holds true for Dr. Wright, whose involvement in this case is minimal—a point that Madera appears to concede by omitting Dr. Wright from his response to the defendants' summary judgment motion. According to Madera, at some unspecified point during his incarceration he approached Dr. Wright, who was visiting Arthur Kill, and complained of medical problems. Dr. Wright told Madera that he would "get back" to him with a note, but never did so. Dr. Wright's failure to follow-up on this brief, informal encounter is not constitute deliberate indifference.

D.    Qualified Immunity

Public officials are protected by qualified immunity so long as "their conduct does not violate clearly established . . . rights of which a reasonable person would have known." <u>Vincent v. Yelich</u>, 718 F.3d 157, 166 (2d Cir. 2013). The qualified immunity inquiry "turns primarily on objective factors." <u>Id.</u> (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 819 (1982)). "If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct." <u>Harlow</u>, 457 U.S. at 818-19.

The principles governing this case are clearly established. It is well-settled that prison officials violate the Eighth Amendment when they are deliberately indifferent to a prisoner's serious medical need, see, e.g., Hathaway, 37 F.3d at 66, and the Second Circuit made clear as early as 1996 that diminished eyesight can constitute such a condition. See Koehl, 85 F.3d at 88. Because a reasonable jury could conclude that Dr. Ezekwe and Dr. Gomprecht were deliberately indifferent to Madera's vision problems, they are not entitled to qualified immunity.

## CONCLUSION

For the reasons stated above, the defendants' motion for summary judgment is GRANTED as to Dr. Montalbano, Superintendent Breslin, and Dr. Wright and DENIED as to Dr. Ezekwe and Dr. Gomprecht.

SO ORDERED.

Dated: Brooklyn, New York
      December *n*, 2013

                    /s/ Judge Raymond J. Dearie

                    RAYMOND J. DEARIE
                    United States District Judge

# CHRONOLOGY

**Dec. 16:** Madera complains of blurry vision. Dr. Ezekwe schedules an urgent exam at SIUH.

**Dec. 26:** Madera is supposed to be examined at SIUH. There are no records of this exam.

*2009*

*2009*

**Apr. 1:** Madera again complains of blurry vision. Dr. Ezekwe schedules an urgent exam.

**Apr. 7:** Madera is diagnosed at SIUH with narrow angles and a cataract and asked to return on Apr. 14. He requires LPI before the cataract can be removed.

**May 15:** Madera is examined at SIUH. SIUH indicates that Madera needs "insurance authorization" and asks him to return in two weeks for LPI.

**Jun. 9:** Dr. Gomprecht obtains Madera's consent for LPI. Appointment scheduled for June 30.

**Jun. 30:** The SIUH doctor misses the LPI appointment.

**Jul. 21:** Nurse Yeary attempts to re-schedule LPI.

**Jul. 30:** LPI appointment set for Sept. 1. Madera is authorized to remain in his dorm area for vision reasons.

**Aug. 15:** Madera complains about a grey film over his cornea and is taken to the SIUH emergency room. He is diagnosed with worsening cataracts.

**Sept. 1:** LPI surgery on Madera's right eye.

**Oct. 8:** Madera files internal grievance.

**Oct. 20:** Follow-up appointment at SIUH. Madera has a dense white cataract in his left eye. SIUH recommends that Madera return in one month for LPI on his left eye.

**Nov. 2:** Madera complains of bad vision in his left eye. The next day, he meets with Dr. Gomprecht, but they discuss his boots, not his vision.

**Nov. 5:** Madera is examined at SIUH for heart problems.

**Nov. 24:** Dr. Gomprecht gets consent from Madera for left eye LPI and asks her staff to schedule an appointment.

**Dec. 3:** APS seeks clarification of Dr. Gomprecht's request for LPI.

**Dec. 11:** APS denies LPI request because Dr. Gomprecht has not responded.

**Dec. 14:** Dr. Gomprecht reviews Madera's chart.

**Dec. 29:** Dr. Gomprecht realizes that her request for left eye LPI was denied. She resubmits the request.

*2010*

*2010*

**Jan. 4:** APS approves Dr. Gomprecht's request for LPI on Madera's left eye.

**Feb. 9:** Dr. Gomprecht meets with Madera to discuss LPI and cataract surgery.

**Mar. 3:** Madera undergoes left eye LPI.

**Mar. 22:** Coronary angiogram at SIUH.

**March 23:** Left eye LPI procedure is redone. SIUH recommends that A-scans, in preparation for cataract extraction, take place within 2 weeks.

**Apr. 27:** Dr. Gomprecht requests appointments for LPI follow-up and A-scans in preparation for cataract surgery.

**May 25:** Dr. Gomprecht tells Madera that heart problems are complicating the scheduling of his eye surgery.

**July 7:** Madera is authorized to use a wheelchair.

**Aug. 9:** Right eye cataract surgery.

**Nov. 8:** Left eye cataract surgery.